UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
JAMES L. BUCKNER,

Petitioner,

– against –

JOHN BURGE, SUPERINTENDENT,
ELMIRA CORRECTIONAL FACILITY,

Respondent.
-----------------------------------------------------------x

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y
★   MAR 3 1 2010
P.M.
TIME A.M.

**MEMORANDUM AND ORDER**

06-CV-1180 (SLT) (CLP)

**TOWNES, United States District Judge:**

Petitioner James L. Buckner, proceeding *pro se*, petitions this Court for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254, challenging his December 4, 2003 conviction in the New

York State Supreme Court, Kings County. A jury convicted Buckner of Murder in the First

Degree (N.Y. Penal Law § 125.27) and the trial court sentenced him to life imprisonment without

parole. Buckner argues in this petition that the trial court denied him his due process right to a

fair trial when it declined to instruct the jury on New York State's extreme emotional disturbance

affirmative defense. For the reasons set forth below, the petition is denied.

## BACKGROUND

Around 9:00 on the morning of April 20, 2002, Buckner began arguing with his long-

term, live-in girlfriend, Sabrina Clark, about her frequently going out to nightclubs with friends

without him. Buckner and Clark's two young children and Clark's 12-year-old daughter from a

previous relationship, Shanaye Clark, were present in the apartment throughout the argument. At

some point during the argument Clark's mother, Susan Garrett, also entered the apartment. The

argument continued until approximately 4:00 p.m.

Buckner grew increasingly upset during the argument and eventually strangled Clark.

After killing Clark, Buckner strangled Garrett as well. Buckner then entered the back bedroom



where the children were located and asked them if he could hug them. After doing so, he packed a laundry bag with clothing and offered to get the children soda and ice cream from a store down the street. He then left the apartment, located a police vehicle parked outside, and reported to the officers that he had found Clark unconscious in the apartment.

After the police inspected the apartment with Buckner, Buckner was brought to the police station for questioning. Buckner made a disjointed statement at the police station purporting to detail the day's events. Buckner stated that he and Clark had rough sex the night before, during which she bumped her head in the bathroom. Buckner told police that during the argument Clark threw bleach at him and was behaving strangely.

Buckner said that while he was in the back bedroom with his children he heard a loud crash. When he ran into the living room, Clark threw a punch at him and jumped on his back. He then shook her off his back, she fell, and he heard another loud crash. Buckner stated that he then noticed Clark was only wearing underwear and that he then returned to the back bedroom where the children were, at which point Shanaye asked him for some soda. Buckner then told her he was going to the store for some soda, and before he left the apartment he noticed Clark lying on the floor. (Tr. at 146). Buckner also stated that after finding the victims in the apartment he immediately attempted to clear out unseen obstructions from their throats because he thought they were choking. Buckner also told police that at some point after discovering the bodies, he began to cook a meal but soon realized that was "crazy," and went to find police. (Tr. at 39).

Buckner was subsequently indicted on two counts of murder in the first degree and four counts of murder in the second degree. On November 3, 2003, Buckner went to trial before Justice Feldman in the Supreme Court of the State of New York, Kings County.

2

**The Trial**

Several witnesses testified at trial regarding Buckner's appearance and demeanor before and after the homicides. Shanaye Clark testified that Buckner was "sweating" during the argument shortly before the homicides. (Tr. at 106). Clark stated that while Buckner's hands were around her mother's throat and she was gasping for air, her mother asked Buckner if the children "could go in the [other] room so [they] couldn't see it," and that Buckner permitted them to do so. (Tr. at 113). Shortly thereafter, Buckner entered the room where the children were and asked them to give him a hug, offered to bring them soda and ice cream, and began putting clothing into a laundry bag. (Tr. at 115). On cross examination, Clark recalled having told the police that, during the argument, Buckner "looked crazy" and "had his eyes wide open . . . [a]nd his hair was mussed up." (Tr. at 129). Clark was also asked if Buckner seemed to be acting crazy that day, to which Clark responded, "Yes," and stated that she had not seen him act that way before. (Tr. at 128).

Police Officer Zabransky testified that Buckner approached him and his partner in their squad car to request assistance, saying "his girl was upstairs in his apartment and unconscious." (Tr. at 28). Shortly thereafter, as Zabransky and his partner were entering the apartment lobby with Buckner to investigate, Buckner added that there was a second unconscious woman in the apartment. (Tr. at 30). Zabransky testified that Buckner "appeared to be out of breath because he had just run across the street . . . [and] was sweating and his general nature appeared to be more of concern for a loved one that was injured." (Tr. at 45). He also testified that Buckner "was upset" but "remained calm, [and] didn't get out of control at all. He remained calm." *Id.* When asked whether Buckner exhibited any extreme or bizarre behavior at all, Officer Zabranksy

3

replied, "No." (Tr. at 45-46). On cross examination, Officer Zabransky stated that Buckner did not give the officers any trouble or problems and that he followed their directions. (Tr. at 53).

Another police officer, Officer Martinez, testified that during questioning at the police station Buckner was "jittery, nervous." (Tr. at 150). Martinez stated that Buckner drank approximately forty cups of water, five sodas, and smoked a couple packs of cigarettes over the course of approximately eight to nine hours in custody. (Tr. at 159). Martinez testified that Buckner appeared nervous during questioning and that he was upset and intermittently crying while Martinez recorded his three-page statement to the police. (Tr. at 146-149, 164). Martinez also stated that Buckner would call out for him whenever Buckner couldn't see him, and Buckner would show relief upon Martinez's return. (Tr. at 169-70).

Buckner testified that during the argument with Sabrina Clark he was "angry" and "a little sad." (Tr. at 238). He also said that during questioning by Officer Martinez he was "[a] little agitated" and was nervous. (Tr. at 256). Buckner testified that he was later admitted to Kings County Psychiatric Hospital for two months (Tr. at 257), but it is unclear from the record why or how soon after his arrest he was admitted. Buckner also stated that he did not know how blood got on his pants or a pillowcase in the apartment. (Tr. at 260-61). Buckner also admitted at trial that he deliberately lied to police about finding the victims unconscious because "he didn't want [the police] to know that [he] had anything to do with them dying." (Tr. at 282).

**The Jury Instructions**

At the charge conference, defense counsel requested an instruction on the extreme emotional disturbance affirmative defense. Justice Feldman concluded that the objective prong

4

was satisfied by the circumstances under which Buckner believed himself to be prior to the

homicides. The judge noted:

> The objective element has been satisfied through defendant's
> testimony that he realized his relationship of six years was
> disintegrating, that it was hurt by not being included in his wife's
> social life and that on the day of his killings, . . . his wife told him
> he would have to leave the house. (Tr. at 327).

The judge found, however, that the subjective prong of the affirmative defense had not been

satisfied. In support of her conclusion, Justice Feldman noted that there was no evidence that

"defendant acted as a result of a loss of self-control." (Tr. at 327). The judge particularly noted

that "[Shanaye Clark's] testimony only illustrates an angry argument which is insufficient alone

to establish a loss of self-control," and that there was otherwise no evidence in the record to

support a finding that Buckner acted under an extreme emotional disturbance. (Tr. at 327-28).

Justice Feldman charged the jury on one count each of murder in the first degree, murder

in the second degree (under a depraved indifference theory), and manslaughter in the first degree.

The jury found Buckner guilty of first-degree murder. Justice Feldman sentenced Buckner to life

imprisonment without possibility of parole. (Sent. Tr. at 12).

**Appeals**

The Appellate Division affirmed Buckner's conviction on November 14, 2005. The court

held that the trial court properly denied Buckner's request to charge the extreme emotional

disturbance affirmative defense because Buckner had not submitted any psychiatric evidence,

claimed he was innocent, and submitted no other evidence indicating he suffered from an

emotional distress during the homicides. The court concluded that "the evidence merely

established that the defendant was angry or upset, but not that he had lost self-control." *People v.*

*Buckner*, 23 A.D.3d 492, 492 (N.Y. App. Div., 2d Dept. 2005). The New York Court of Appeals

denied Buckner's application for leave to appeal on February 24, 2006. *People v. Buckner*, 6

N.Y.3d 810 (2006).

### Buckner's Petition

Buckner submitted a timely petition for habeas corpus relief on March 10, 2006, and

amended his petition on May 7, 2007. Buckner argues in his amended petition that his due

process right to a fair trial was violated when the trial court declined to charge the jury on New

York's extreme emotional disturbance affirmative defense. He argues that the trial court

prevented him from presenting a proper defense by declining to give the instruction because

ample evidence of extreme emotional disturbance was presented at trial.

## DISCUSSION

### I.    Federal Habeas Corpus Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal

court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on

the merits" in state court only if it concludes that the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d). An "adjudication on the merits" is a substantive, rather than a procedural,

resolution of a federal claim. *See Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir. 2001) (citations

omitted). A state court has adjudicated a state petitioner's claim on the merits when it "(1)

disposes of the claim on the merits, and (2) reduces its disposition to judgment." *Bell v. Miller,*

500 F.3d 149,155 (2d Cir. 2007) (quoting *Sellan,* 261 F.3d 303 at 312).

Under § 2254(d)(1) – the "contrary to" clause – a federal habeas court may grant the writ

"if the state court applies a rule that contradicts the governing law set forth in [Supreme Court]

cases" or "if the state court confronts facts that are materially indistinguishable from a relevant

Supreme Court precedent and arrives at a result opposite" to that reached by the Supreme Court.

*Bell v. Cone,* 543 U.S. 447, 452-53 (2005) (quoting *Williams v. Taylor,* 529 U.S. 362, 405

(2000)). Under § 2254(d)(2) – the "unreasonable application" clause – a federal habeas court

may grant the writ if the state court "'identifies the correct governing legal principle from [the

Supreme] Court's decisions but unreasonably applies that principle to the facts' of the petitioner's

case." *Rompilla v. Beard,* 545 U.S. 374, 380 (2005) (quoting *Wiggins v. Smith,* 539 U.S. 510,

520 (2003)). "[F]ederal law, as determined by the Supreme Court, may as much be a generalized

standard that must be followed, as a bright-line rule designed to effectuate such a standard in a

particular context." *Overton v. Newton,* 295 F.3d 270, 278 (2d Cir. 2002).

## II.    Federal Review of State Court Jury Instructions

A federal habeas court typically does not review state-law questions determined by state

courts, including the propriety of jury instructions. *Estelle v. McGuire,* 502 U.S. 62, 67-68

(1991). Accordingly, "[w]here an error in a jury instruction is alleged, 'it must be established not

merely that the instruction is undesirable, erroneous, or even "universally condemned," but that it

violated some right which was guaranteed to the defendant by the Fourteenth Amendment.'"

*Davis v. Strack,* 270 F.3d 111, 123 (2d Cir. 2001) (quoting *Cupp v. Naughten,* 414 U.S. 141, 146

(1973)). An improper jury instruction can constitute a federal constitutional violation when the

7

"ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Davis v. Strack*, 270 F.3d at 123 (quoting *Cupp*, 414 U.S. at 147). Therefore, "[t]he question is not whether the trial court gave a faulty instruction, but rather 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Davis*, 270 F.3d at 123 (citing *Cupp*, 414 U.S. at 147).

In *Davis*, the Second Circuit Court of Appeals set out a three-step analysis for determining whether a state court's refusal to give a specific jury instruction violates federal due process. Under this analysis, a federal court can grant habeas relief only if it can answer the following three questions affirmatively. First, was the jury instruction required as a matter of New York State law? Second, did the failure to give the required charge violate due process according to the standard set out in *Cupp*? Third, was the state court's failure of such a nature that it is remediable by habeas corpus, given the limitations prescribed by 28 U.S.C. § 2254?

## III. Was an Extreme Emotional Disturbance Instruction Required under New York Law?

In keeping with *Davis*, this Court must first determine whether Buckner was entitled to the extreme emotional disturbance charge as a matter of New York State law. To answer that question, federal courts must consult state law and defer to state-court interpretation of the state's laws to the extent that those interpretations are themselves constitutional. *Davis*, 270 F.3d at 123 n.4.

Recognizing that some intentional homicides may result from "an understandable human response deserving of mercy," *People v. Casassa*, 49 N.Y.2d 668, 680-81 (1980), *cert denied sub nom. Casassa v. New York*, 449 U.S. 842 (1980), the New York State Legislature created the

affirmative defense of extreme emotional disturbance, which reduces intentional murder to first-degree manslaughter if the defendant establishes its elements by a preponderance of the evidence. N.Y. Penal Law § 125.20(2); *see* N.Y. Penal Law § 125.27(2)(a); *see also People v. Moye*, 66 N.Y.2d 887, 890 (1985) (discussing the elements of the extreme emotional disturbance affirmative defense). Extreme emotional disturbance is a statutory, partial affirmative defense that is available where "[t]he defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse." *Vargas-Sarmiento v. U.S. Dep't of Justice*, 448 F.3d 159, 166 (2d Cir. 2006) (citing N.Y. Penal Law § 125.25(1)(a)).

The affirmative defense of extreme emotional disturbance has two elements. A defendant must first prove that he or she acted under the influence of an extreme emotional disturbance, and, second, that there was a reasonable explanation or excuse for that disturbance. *Murden v. Artuz*, 497 F.3d 178, 194 (2d Cir. 2007), *cert denied sub nom. Murden v. Ercole*, 552 U.S. 1150 (2008) (citing *People v. Roche*, 98 N.Y.2d 70, 75-76 (2002)). "The first, subjective element is met if there is evidence that [the] defendant's conduct at the time of the incident was *actually influenced by* an extreme emotional disturbance." *Id.* at 195 (quoting *Roche*, 98 N.Y.2d at 75-76) (emphasis added). The second, objective element "requires proof that [the] defendant's emotional disturbance was supported by a reasonable explanation or excuse." *Id.* This element is "determined by viewing the subjective mental condition of the defendant and the external circumstances as the defendant perceived them to be at the time, however inaccurate that perception have may been, and assessing from that standpoint whether the explanation or excuse for the emotional disturbance was reasonable." *Id.*

For a defendant to be entitled to an extreme emotional disturbance instruction, sufficient evidence must be presented for the jury to find by a preponderance of the evidence that both elements of the affirmative defense are satisfied. *People v. White*, 79 N.Y.2d 900, 902-03 (1992); *Moye*, 66 N.Y.2d at 889 (citing *People v. Walker*, 64 N.Y.2d 741, 743 (1984)). In reviewing a lower court's denial of a jury instruction of an affirmative defense such as extreme emotional disturbance, a reviewing court must consider the evidence in the light most favorable to the defendant. *White*, 79 N.Y.2d at 903. "In the absence of the requisite proof, an extreme emotional disturbance charge should not be given because it would invite the jury to engage in impermissible speculation concerning [the] defendant's state of mind at the time of the homicide." *Roche*, 98 N.Y.2d at 76 (citing *Walker*, 64 N.Y.2d at 743).

Notably, a defendant's outright claim of innocence cannot by itself defeat entitlement to the extreme emotional disturbance instruction. *White*, 79 N.Y.2d at 903. However, a defendant's repeated claims of innocence may impact the sufficiency of the evidence offered to show that he acted under the influence of an extreme emotional disturbance at the time of the homicide. *Id.*

In this case, Justice Feldman found that Buckner failed to establish the subjective element. Accordingly, this Court will focus first on the issue of whether that determination was erroneous.

"A defendant cannot establish an extreme emotional disturbance defense without evidence that he or she suffered a mental infirmity not rising to the level of insanity at the time of the homicide, *typically manifested by a loss of self-control*." *Roche*, 98 N.Y.2d at 75 (emphasis added). A defendant need not introduce expert psychiatric evidence to establish the defense.

10

*Moye*, 66 N.Y.2d at 890. However, "not all mental infirmities merit a manslaughter charge based on extreme emotional disturbance." *Roche*, 98 N.Y.2d at 75 (citing *Casassa*, 49 N.Y.2d at 677).

Although proof concerning the nature of the wounds defendant inflicted is relevant, the New York Court of Appeals has never held that a jury may infer an extreme emotional disturbance from the brutal or violent nature of the homicide alone. *See id.*, at 77-78. The New York Court of Appeals has considered the brutal or violent nature of the homicidal acts, however, when that evidence is "linked to other compelling evidence of extreme emotional disturbance." *Id.*; *see Moye*, 66 N.Y.2d at 890.

*Moye* aptly illustrates the factual circumstances under which the subjective element of extreme emotional disturbance is established and a jury instruction must be given if requested. The defendant in *Moye* admitted to killing a female sexual partner after she taunted and laughed at him for being unable to perform sexual intercourse with her. *Id.* at 889. The defendant decapitated the woman, wrapped her headless torso in rugs and placed it in her bathtub, and threw her head into a neighboring backyard. *Id.* The New York Court of Appeals held that the defendant's "savage acts of mutilating and decapitating his victim, *coupled with* his statements to the police and District Attorney that 'something snapped' inside him when she mocked and taunted him, that he went 'bananas' and he needed help, were evidence of a loss of self-control associated with the defense." *Id.* at 890 (emphasis added). The New York Court of Appeals in *Moye* held that the trial court improperly denied the extreme emotional disturbance instruction. *Id.*

In *Roche* and *White*, in contrast to *Moye*, the defendants denied involvement in the homicides, claiming to have found their wives unconscious upon returning to their homes. Both

Roche and White proffered no psychiatric evidence to support an extreme emotional disturbance. Moreover, neither defendant told the police or any other witness that he had experienced a loss of self-control or other infirmity at the time of the homicides. The New York Court of Appeals held in both *Roche* and *White* that the defendant was not entitled to the extreme emotional disturbance instruction, both times observing that the record was barren of any statement of defendant or of other evidence offered by a witness to suggest that the defendant suffered from an extreme emotional disturbance at the time of the homicide.

The Court of Appeals reached this conclusion even though White's post-homicide conduct was very disturbing. White washed the victim's body, wrapped it in a bedspread, placed it in a closet in their shared apartment, and went about his daily business with his stepchildren still in the apartment for an entire week. White, 79 N.Y.2d at 904. White argued that this highly abnormal post-homicide conduct, combined with his tumultuous relationship with the victim prior to the homicides, was probative of his state of mind at the time of the killing. *Id.* However, the *White* Court disagreed, finding that the evidence of post-homicide conduct, although highly bizarre and erratic, was not sufficiently probative of his mental state at the time of the homicide to establish the subjective element of extreme emotional disturbance. *See id.*

In *Roche*, the defendant contrived a false explanation for the victim's wounds by telling neighbors she had committed suicide. *Roche*, 98 N.Y.2d at 77. Roche also gathered several items into a bag and removed them from the apartment so that investigating officers would not discover them – conduct not typically associated with the loss of control characteristic of an extreme emotional disturbance. *Id.*

Here, viewing the evidence in the light most favorable to the defendant, the record amply supports Justice Feldman's decision not to charge on extreme emotional disturbance. Buckner did not experience the "loss of control" typically associated with an extreme emotional disturbance. Buckner stopped strangling Sabrina Clark when she asked him if the children could leave the room so they couldn't see what was happening. Buckner's willingness to stop, consider his actions, and comply with Clark's request, although characteristic of mercy, demonstrates that Buckner was aware of what he was doing, knew it was wrong and that his children should not be permitted to see it. Therefore, he did not suffer the "loss of control" associated with an extreme emotional disturbance.

This case is highly analogous to *Roche* and *White*. Buckner fabricated a story to police that he happened upon the victims' bodies upon returning to his apartment. Buckner did not proffer any psychiatric evidence regarding his mental state, nor did he make any statements regarding his mental state at the time of the homicides. Moreover, here, as in *Roche* and *White*, there is no evidence from Buckner or any other witness to suggest that he suffered an extreme emotional disturbance at the time of the homicide.

Instead, Buckner relies primarily on his post-homicide conduct to establish the subjective element, as did the defendant in *White*. However, Buckner's post-homicide conduct, which is far less bizarre than White's, is inconsistent with the loss of control associated with an extreme emotional disturbance. Buckner told police he began cooking a meal following the homicides but soon realized that was "crazy." (Tr. at 39). He also packed a bag full of clothes but did not leave the apartment with the bag. (Tr. at 277-78). Indeed, most of Buckner's post-homicide conduct easily could be interpreted as reasonable or even calculated. Buckner manufactured

13

several themes on the same story that he happened upon the unconscious bodies of the victims in his apartment and later explained that some of the victim's injuries resulted after he found them unconscious and he attempted to clear their mouths of allegedly unseen obstructions. At his trial, Buckner admitted that he deliberately lied to the police because he "didn't want [the police] to know that [he] had anything to do with them dying." (Tr. at 282). Furthermore, Buckner's seemingly bizarre offer to hug the children and to bring them soda and candy may have been designed to mollify the children in the apartment in order to assist his planned escape, as indicated by him packing clothes into a laundry bag shortly after the homicides. Accordingly, Buckner's post-homicide conduct, like that of White, is insufficient on its own to justify a finding of extreme emotional disturbance.

Indeed, Buckner's post-homicide conduct is similar to Roche's, which was also held to be insufficient to support an extreme emotional disturbance charge. Like Roche, Buckner collected several items in the apartment, possibly in preparation for an escape, and Buckner fabricated a story and told police he discovered the victims' bodies in his apartment.

In sum, evidence was presented at trial to establish that Buckner was upset or angry immediately before the homicides, and that he was nervous and concerned thereafter. But the record lacks sufficient credible evidence to permit the jury to find by a preponderance of the evidence that the elements of the affirmative defense had been established. *See White*, 79 N.Y.2d at 902-903. As in *White* and *Roche* and unlike *Moye,* the record before the Court is devoid of any statements by Buckner or by other witnesses, or of other evidence that demonstrates Buckner suffered from an extreme emotional disturbance at the time of the homicides. Therefore,

14

Buckner was not entitled to the instruction and the trial judge's refusal to instruct the jury on extreme emotional disturbance was appropriate.

## IV. Would an Improper Denial of an Instruction Required by New York State Law Have Resulted in a Denial of Due Process?

Even if this Court were to find that Buckner was entitled to a jury instruction on extreme emotional disturbance, the trial court's refusal to give that charge did not result in a denial of due process. As discussed above, to demonstrate that an erroneous jury instruction rendered the trial outcome unfair, a petitioner must show that the court's omission was "sufficiently harmful to make the conviction unfair." *Jackson v. Edwards*, 404 F.3d 612, 624 (2d Cir. 2005) (quoting *Davis*, 270 F.3d at 124). Because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law," *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977), the petitioner bears a heavy burden in showing that the failure to instruct rises to the level of a constitutional violation. *See Williams v. Bennett*, 2001 U.S. Dist. LEXIS 10627, at *28 (S.D.N.Y.).

In determining when the refusal to charge the jury on an affirmative defense is sufficiently harmful to violate federal due process, the Second Circuit has focused on the issues of whether the affirmative defense was central to the petitioner's theory at trial and whether that defense was made out by credible evidence. In *Davis*, for example, the petitioner confessed to intentionally shooting the victim and relied exclusively on a justification defense. *Davis*, 270 F.3d at 131. Moreover, although Davis's defense was made out through his testimony at trial, "the jury, by ruling in Davis's favor on the question of extreme emotional disturbance, showed that it generally accepted the truthfulness of Davis's testimony." *Id.* Accordingly, the effect of

the trial court's refusal to charge the jury on the justification defense "w[as] to deprive Davis entirely of his defense – on which he had a significant possibility of prevailing – and to ensure his conviction." *Id.* Characterizing these effects as "catastrophic," the *Davis* Court held that the trial court's refusal to instruct the jury on the defense of justification deprived Davis of his due process right to a fair trial.

The *Davis* panel contrasted the case before it to *Blazic v. Henderson*, 900 F.2d 534, 541-43 (2d Cir. 1990). In *Blazic*, the Second Circuit found that the improper instruction did not violate due process because there was no basis upon which to conclude that the jury would have responded differently had the charge been given. *See Blazic*, 900 F.2d at 542. In *Blazic*, the petitioner's principal claim was that the fatal shot had been fired accidentally. *Id.* at 536. Indeed, Blazic's trial counsel "initially agreed with the trial court that a justification charge was not warranted," and requested the justification defense only after reconsidering the issue overnight at the trial court's invitation. *Id.* The jury ultimately convicted Blazic of intentional murder, implicitly rejecting petitioner's testimony that the shooting was accidental. *Id.* at 537, 542-43.

On appeal, the Second Circuit found that a justification charge was warranted under New York law, but opined that the failure to give that charge did not affect the outcome of the trial. *Id.* at 542. The court noted, *inter alia*, that Blazic's testimony "was the only evidence supporting a justification claim," but that the jury "would have had to reject significant aspects of Blazic's account" in order to have convicted him of intentional murder. *Id.* at 543. While the jury theoretically could have accepted the remaining testimony, the Second Circuit "discern[ed] no reasonable view of the evidence derived by parsing his testimony that supported a finding of

16

justification." *Id.* Accordingly, the Second Circuit "perceive[d] no basis to conclude that a jury would have responded differently had the charge been given," and the court "reject[ed] the contention that the omission of a justification charge 'so infected the entire trial that the resulting conviction violate[d] due process.'" *Id.* (quoting *Cupp*, 414 U.S. at 147).

The Court finds, as in *Blazic*, that there is no reasonable view of the testimony and evidence adduced at trial that supports a finding of an extreme emotional disturbance. Here, as in *Blazic* and as discussed above, there was virtually no evidence adduced at trial to demonstrate an extreme emotional disturbance. Furthermore, as in *Blazic*, the instruction at issue here did not directly relate to the defense's central theory at trial. Buckner's defense largely focused on the prosecution's burden of proof and whether Buckner intended to kill the victims. The defense's strategy at trial was to discredit the state's witnesses and to emphasize discrepancies in their testimony, not to emphasize Buckner's state of mind during the killings. Indeed, Buckner did not even testify concerning his state of mind when he killed the victims, but consistently claimed that he was completely innocent.

This case is markedly different from *Davis*, in which the Second Circuit panel concluded that the trial court's denial of the instruction "completely deprived Davis of his highly credible defense to the homicide charge and guaranteed his conviction." *Davis*, 270 F.3d at 131. Contrasted to *Davis*, Buckner's requested instruction is much more like "a fantastic, improbable defense that the jury was unlikely to adopt." *Davis*, 270 F.3d at 132. Given the overwhelming evidence of guilt and the profound lack of evidence regarding extreme emotional disturbance at the time of the homicides, any finding by the jury of extreme emotional disturbance would have been purely speculative.

In sum, the record contains overwhelming evidence that Buckner committed the homicides yet is virtually barren of evidence suggesting that Buckner did so while under an extreme emotional disturbance. As discussed above, at most the evidence indicated that Buckner was angry or upset before and after the homicides, but there was not sufficient, credible evidence to permit a jury to find by a preponderance of the evidence that Buckner committed the homicides while under an extreme emotional disturbance. Even if the trial court's denial of the instruction were erroneous, that error would not have deprived Buckner of a defense on which he was likely to prevail. The denial did not ensure his conviction, nor was the denial in any sense "catastrophic." *Davis*, 270 F.3d at 132. Thus, even were Buckner entitled to the instruction, which the Court finds he was not, the absence of the extreme emotional disturbance instruction did not render the trial unfair in any constitutional sense.

## V.     Does a Failure To Charge an Affirmative Defense Permit Relief Under AEDPA?

Because the Court finds that the trial court did not improperly deny Buckner's request for the jury instruction, and because even were that denial improper, it would not have violated due process, it is unnecessary to reach this question and the Court declines to do so.

## CONCLUSION

For the reasons set forth above, Buckner was not deprived of his due process rights or of the opportunity to present his affirmative defense. Accordingly, the petition for the writ of habeas corpus is denied. The Court declines to issue a certificate of appealability because the petitioner has not made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

**SO ORDERED.**

/SANDRA L. TOWNES
United States District Judge

Dated: March 31, 2010
       Brooklyn, New York